Justin F. Marquez, SBN 262417
justin@wilshirelawfirm.com
Thiago M. Coelho, SBN 324715
thiago@wilshirelawfirm.com
Robert J. Dart, SBN 264060
rdart@wilshirelawfirm.com
April Yang, SBN 330951
april@wilshirelawfirm.com
**WILSHIRE LAW FIRM**
3055 Wilshire Blvd., 12th Floor
Los Angeles, California 90010
Telephone: (213) 381-9988
Facsimile: (213) 381-9989

*Attorneys for Plaintiff LAVARIOUS GARDINER*
*and Proposed Class Counsel*

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAVARIOUS GARDINER, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>WALMART INC., a Delaware corporation; DOES 1 to 10, inclusive,<br><br>    Defendants. | CASE NO.: 4:20-cv-04618-JSW<br><br>**CLASS ACTION**<br><br>**AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Lavarious Gardiner, individually, and on behalf of all others similarly situated, brings this action based upon his personal knowledge as to himself and his own acts, and as to all other matters upon information and belief, based upon, *inter alia*, the investigation of his attorneys.

## NATURE OF THE ACTION

1.      Defendant Walmart, Inc. ("Walmart") is a retailer selling goods at its stores and online via its website.  Hundreds of millions of customers shop at Walmart every week at its physical store locations and on its website.  Those customers reasonably expect the most stringent level of protection for their personally identifiable information ("PII") when entrusting their

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd., 12th Floor
Los Angeles, CA 90010-1137

highly sensitive information – including home addresses and credit card numbers – to Walmart, as is required to complete purchases online and/or create a customer account on Walmart's website.  What Walmart customers did not and do not expect is that their personal and sensitive information, including access to their credit card and financial accounts, would be harvested by unauthorized individuals from Walmart's website and sold on the dark web.  And yet that is precisely what has happened, with the account information and data of thousands, if not millions, of Walmart customers currently available for sale on the dark web.

2.      Plaintiff, individually, and on behalf of those similarly situated persons (hereafter, "Class Members"), brings this class action to secure redress against Defendants for their reckless and negligent violation of customer privacy rights.  Plaintiff and Class Members are individuals who were customers of Walmart during at least the four-year period prior to the date of the filing of this Complaint to the present.

3.      Plaintiff and Class Members suffered significant injuries and damages.   The security breach compromised the full names, addresses, financial account information, credit card information, and other PII of Walmart's customers.

4.      As a result of Defendants' wrongful actions and inactions, unauthorized individuals gained access to and harvested Plaintiff's and Class Members' PII from Walmart's website.  Walmart's website's vulnerabilities led to direct breaches of Walmart's internal data systems.  Plaintiff and Class Members have been forced to take remedial steps to protect themselves from future loss and injury.  Indeed, all Class Members currently remain at a very high risk of identity theft and/or credit card fraud, and prophylactic measures, such as the purchase of credit monitoring services and software, are reasonable and necessary to prevent and/or mitigate future loss.

5.      As a result of Defendants' wrongful actions and inactions, highly sensitive customer information was stolen.  Many customers of Walmart have had their PII compromised, their privacy rights violated, have been exposed to a critical and continuing risk of fraud and identify theft, and have otherwise suffered damages.

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12ᵗʰ Floor
Los Angeles, CA 90010-1137

6.    Though Plaintiff's transaction occurred prior to that date, there is evidence that the breach occurred after or has continued through January 1, 2020.  PII from Walmart customers available for purchase on the dark web includes credit card data from credit cards which, due to their expiration dates, could not have been issued prior to January 1, 2020.   As there is evidence indicating a single, continuous, and unaddressed data breach that has compromised Walmart customers' data, it appears that Plaintiff's data, which he first entrusted to Walmart in 2016, was "stored" in Walmart's systems or records and then later exposed in a data breach occurring after or continuing through January 1, 2020.

7.    Further, despite the facts that the customer data and customer accounts are currently available for sale on the dark web and Walmart's website contains numerous concerning cybersecurity vulnerabilities by which the data may have been improperly obtained, Walmart has completely neglected to notify its customers that their data has either already been stolen or is now at a continuing risk of breach and misappropriation. The customers whose PII has already been compromised and put up for sale on the dark web, as well as all the other customers who have entrusted their PII to Walmart, deserve and are entitled to redress for their actual injuries and protection against the perpetual risk of future harm.

## THE PARTIES

8.    Plaintiff Lavarious Gardiner is a California citizen residing in San Francisco, California.  Plaintiff is a customer who entrusted his PII to Walmart – a necessary step in the process of making online purchases and/or creating a customer account from Walmart's website. Plaintiff is informed and believes that his PII was accessed by hackers as a direct result of a breach in Walmart's cybersecurity environment and internal data systems.  Plaintiff made a purchase from Walmart's website in 2016, at which time he entrusted Defendants with his PII and payment information.  Plaintiff does not recall any requirement, during the checkout process on Walmart's website, that he accept or assent to Walmart's Terms of Use.  At some point thereafter, Plaintiff's stored customer data, containing his PII and financial information, was compromised and all of the data associated with his Walmart purchases is currently being sold on the dark web. Consequently, as a necessary and reasonable measure to protect himself from further injury,

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd., 12ᵗʰ Floor
Los Angeles, CA 90010- 1137

3

AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff purchased a credit and personal identity monitoring service to alert him to any potential misappropriation of his data and to combat further risk of identity theft. At a minimum, therefore, Plaintiff has suffered compensable damages because his data, which has a monetary value, is being sold on the dark web against his will and he has been forced to purchase a credit monitoring service out-of-pocket – a reasonable and necessary prophylactic step to prevent and/or mitigate future loss. Exposure of Plaintiff's PII as a result of the Walmart data breach has placed him at an imminent, immediate, and continuing risk of further harm for which he will need to expend time and labor to combat and prevent.

9. Defendant Walmart Inc. is a Delaware corporation with its principal place of business located in Bentonville, Arkansas.

10. Plaintiff is unaware of the true names, identities, and capacities of the defendants sued herein as DOES 1 to 10. Plaintiff will seek leave to amend this complaint to allege the true names and capacities of DOES 1 to 10 if and when ascertained. Plaintiff alleges, upon information and belief, that each of the defendants sued herein as a DOE is legally responsible in some manner for the events and happenings alleged herein, and, as set forth below, that each of the defendants sued herein as a DOE proximately caused injuries and damages to Plaintiff and Class Members.

11. As used herein, "Defendants" shall refer to Walmart Inc. and Does 1 to 10, collectively.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over the state law claims asserted herein pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), since some of the Class Members are citizens of a State different from the Defendant; there are more than 100 putative class members; and the amount in controversy exceeds $5,000,000.

13. The Court also has personal jurisdiction over the parties because, on information and belief, Defendants conduct a major part of their domestic operations with regular and continuous business activity in California, through a large number of stores and with an advertising budget not exceeded in other jurisdictions throughout the United States. Plaintiff's

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12ᵗʰ Floor
Los Angeles, CA 90010-1137

4

AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

and the Class Members' claims arise out of Defendants' business activities in California because Plaintiff's and the Class Members purchased items from the Walmart's website and/or created Walmart customer accounts in and while residing in California and have suffered their injuries in and while residing in California.

14.     Venue is appropriate in this District because, among other things: (a) Defendants directed their activities at residents in this District; and (b) many of the acts and omissions that give rise to this Action took place in this judicial District.

## FACTUAL ALLEGATIONS

### A. Walmart's Data Breach

15.     Walmart is a major American retailer, operating numerous stores and selling goods via its website.  Customers patronizing Walmart's online store must provide Walmart with PII in order to make purchases and/or create customer accounts, including full names, mailing and billing addresses, phone numbers, email addresses, and payment information, usually in the form of credit or debit card information.  Walmart has been the target of at least one successful hack in recent years.  Hackers have obtained access to Walmart customer data and/or accounts by hacking Walmart's website and Walmart's customers' computers by exploiting vulnerabilities on Walmart's website and subsequently selling the stolen customer information on the dark web.

16.     That Walmart has been successfully hacked is illustrated by the fact that the dark web is replete with stolen Walmart customer data and customer accounts for sale.  Over two million customer data and/or accounts are available for sale on websites such as http://wwhclubl4tefzrzf.onion/index.php?threads/skupaju-gifty-amazon-carters-walmart-old-navy-pod-vysokij.58790/page-12/, and   http://blackpasqk3nqfuc.onion/.     Many   similar "marketplaces" exist.

17.     These sale listings on dark web marketplaces contain only enough PII to prove to potential buyers that the sellers really do possess all the information associated with each data set or account.  In 2019, Plaintiff learned that his PII was put up for sale in one such marketplace: http://blackpasqk3nqfuc.onion/.  Included in the seller's listing containing Plaintiff's PII were

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

Plaintiff's name, home address, phone number, and the last four digits and expiration dates of two of his debit cards.

18.     Plaintiff confirmed through extensive online searches that the names, phone numbers, and addresses for many – if not all – of the other individuals whose information is being sold on these marketplaces are correct and verifiable.  The verifiability of these forms of PII in the sale listings indicates the substantial likelihood that the payment information advertised in the listings, including last four digits and expiration dates of credit and debit cards, is also legitimate and within the sellers' possession.  In fact, sellers in dark web marketplaces purposely refrain from posting all of the data they possess for a customer, otherwise they would have nothing left to sell.  Instead, sellers list just enough customer PII to validate that they do indeed possess all of the information they claim to possess – including full credit and debit card numbers, and PIN and CVV codes associated with those payment cards.  No purchaser would purchase the information if it did not include PIN and CVV information, so it must be concluded that this information is included in the items for sale.  Then, once a buyer purchases the data set or account information from the seller, the seller then turns over the remainder of the PII and payment information that would allow the buyer to commit financial fraud and identity theft crimes.  Thus, the harm to the customer is committed at the time when the customer's PII is improperly accessed and stolen, and then when the PII is first posted on the dark web for sale, as there is a robust market for such stolen personal and financial information.  At that point, any subsequent harm to a customer whose PII has been sold on the dark web is more of an eventuality than a mere possibility.

19.     Despite the fact that the PIN or CVV numbers associated with Plaintiff's payment cards were not listed in the seller's posting on the dark web, Plaintiff undoubtedly entrusted Defendants with this information in the course of completing his online purchase, otherwise Walmart would not have been able to charge his debit card and finalize the transaction.  The seller of Plaintiff's PII possesses Plaintiff's PIN or CVV numbers associated with his payment cards and was only withholding publication of that information until a buyer made an acceptable offer for the PII.

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

20.     Cybercriminals have been selling stolen Walmart customer data and/or accounts on dark web marketplaces from January 24, 2020 to May 17, 2020, at the very least.   Walmart customer data and/or accounts being sold by these websites during this time period include data and accounts dated in 2020, along with data and accounts that date back as far back as March 28, 2019.

21.     Many of the "last order dates" contained in records of stolen customer information that have been found are from 2020, indicating that the data came from a breach that occurred in 2020.  "Last order dates" are the dates of a customer's last purchase on Defendants' website before the PII was stolen.  Furthermore, certain information contained within some of these stolen data sets and/or accounts, such as credit card information, could not have been issued prior to January 1, 2020 based upon their expiration date.

22.     Moreover, Plaintiff retains in his possession communications with the hackers in which they state that the data sets and/or accounts they are selling are real data sets and/or accounts that belong to Walmart customers.

23.     Further, the fact that Walmart has been hacked is illustrative of the fact that its systems are quite vulnerable to unauthorized access, misuse of information, and disruption. A scan of Walmart's domains using Open Web Application Security Project Zed Attack Proxy ("OWASP ZAP"), which is widely used in the cybersecurity community to scan websites for documented vulnerabilities, resulted in the exposure of six major vulnerabilities.

24.     These vulnerabilities include:

- Seven instances of private IP addresses being disclosed in the public website code. While this is not a direct attack vector, it may contribute to an attack on Walmart's systems.

- 44 instances of password autocomplete enabled.  This could potentially contribute to a hacker's breach of a user's data set and/or account.  If a script or malware is running on the customer's computer, the script or malware can extract the password from the browser.

- 112,118 instances of the Cookie No HttpOnlyFlag being set, which means that cookies

7

can be accessed by scripts or malware on the client machine. This can be used to conduct session hijacking attacks. If the customer has malware on his or her computer, that malware can manipulate and access cookie data.

- 8,615 instances of cross-site scripting ("XSS") protection not enabled. This is a very serious issue, which means that the site could be vulnerable to the common cross site scripting attack. In such an attack, the hacker injects client-side script into web pages which are viewed by other users, typically targeting areas in which there is a high level of user interaction. When the user interacts with those areas, the website executes the attacker's script rather than the intended website functionality. This would enable the hacker to steal information from the customers.

- 100,061 instances of Cross Domain JavaScript source file inclusion. This would also allow a hacker to perform cross site scripting, by inserting malicious JavaScript.

- 93,060 instances of a cookie without the secure flag being set. This is similar to the No HttpOnlyFlag being set, in that it enables cookies to be accessed through unencrypted connections.

25.     An OWASP ZAP scan of http://grocery.walmart.com and the IP address for Walmart photos revealed similar vulnerabilities on those websites.

26.     Scans using other highly respected vulnerability scanners resulted in affirmation of the aforementioned vulnerabilities, and the finding of additional vulnerabilities which hackers can take advantage of to obtain protected files from a website. For example, a scan of less than 2% of the Walmart website using the Vega vulnerability scanner uncovered 228 high ranked vulnerabilities. These vulnerabilities include the integer overflow vulnerability. Within the integer overflow vulnerability were exposed numbers, of which 224 appeared to be in the format of social security numbers, and multiple numbers that appeared to be in the format of credit card numbers. Vega also found 7 instances where local paths were revealed, which can allow hackers to obtain sensitive information about the server environment.

27.     Plaintiff also conducted a scan of the website using the Nessus tool. Government agencies that use the Nessus tool to scan websites include the IRS, Argonne National Lab,

8

AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

Defense Information Systems Agency, Department of Defense, U.S. Navy, and others.  Plaintiff utilized the Nessus PCI scan.  PCI stands for Payment Card Industry, and the Nessus PCI scan tests the website against the PCI DSS standards, which organizations must follow if they accept payment cards from major credit card brands.  A company that is not PCI compliant can be fined and, in some cases, their payment card privileges can be revoked.  Defendants are not PCI compliant.  The scan showed 20 PCI vulnerabilities, each ranked as high, and identified the following severe issues, each of which would be considered to be an "automatic failure," according to the PCI DSS Approved Scanning Vendors Program Guide (version 3.1):

- Vulnerabilities with a CVSS base score greater than or equal to 4.0;

- Unsupported operating systems;

- Internet reachable database servers;

- Presence of built-in or default accounts;

- Unrestricted DNS Zone transfers;

- Unvalidated parameters leading to SQL injection attacks;

- XSS flaws;

- Directory traversal vulnerabilities;

- HTTP response splitting/header injection;

- Detection of backdoor applications (malware, trojan horses, rootkits, backdoors);

- Use of older, insecure SSL/TLS versions;

- Use of anonymous key exchange protocols (such as anonymous Diffie-Hellman in SSL/TLS); and

- Scan Interference.

28.    The Nessus PCI scan also located three problems with Walmart.com's SSL/TLS certificates.  SSL/TLS stands for Secure Sockets Layer/Transport Layer Security and is how websites encrypt data transmissions.  SSL/TLS utilizes digital certificates to encrypt data.  Security flaws in SSL/TLS certificates make all transmissions vulnerable, including transmissions of credit card information and account details.

AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

29.     The Nessus PCI scan identified the following problems with Walmart.com's SSL/TLS certificates:  SSL certificate cannot be trusted, SSL certificate with wrong hostname, and SSL self-signed certificate.  Each of these problems means that data transmissions on the website are vulnerable.

30.     The Nessus PCI scan also revealed that Defendants are using an outdated protocol, TLS Version 1.1, which is technology that was replaced 12 years ago and has known weaknesses.

31.     The net result of these security flaws allows hackers to access and exfiltrate a large amount of Walmart's customer data in a single, inclusive data breach.  Due to the aforementioned vulnerabilities in how customer information is stored on Walmart.com, information obtained in such a breach could potentially include customer information that had been entered into Walmart's website prior to the actual date of the breach.

### C. California Recognizes the Importance of PII

32.     *California Civil Code* § 1798.81.5(a)(1) states that: "It is the intent of the Legislature to ensure that personal information about California residents is protected. To that end, the purpose of this section is to encourage businesses that own, license, or maintain personal information about Californians to provide reasonable security for that information."

### D. Stolen Information Is Valuable to Hackers and Thieves

33.     It is widely recognized, and the subject of many media reports, that PII is a highly coveted commodity and a frequent target of hackers.  Especially in the technology industry, the issue of data security and threats thereto is well known.  Despite well-publicized litigation regarding data breached, frequent public announcements of data breaches, and having fallen victim to hacks in the past, Defendants maintained an insufficient and inadequate system to protect the PII of Plaintiff and Class Members. *See* http://www.wired.com/2009/10/walmart-hack/.

34.     Legitimate organizations and members of the criminal underground alike recognize the value of PII.  Otherwise, they would not aggressively seek and pay for it.  As previously seen in one of the world's largest data breaches, hackers compromised the card holder data of 40 million customers of Target, another "big box" store very comparable to Walmart. *See*

10

AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd., 12th Floor
Los Angeles, CA 90010-1137

"Target: 40 million credit cards compromised," CNN Money, Dec. 19, 2013, *available* at http://money.cnn.com/2013/12/18/news/companies /target-credit-card/, attached hereto as **Exhibit A.**   In contrast, DataCoup provides just one example of a legitimate business that pays users for personal information.   *See* http://money.com/money/3001361/datacoup-facebook-personal-data-privacy/, attached hereto as **Exhibit B**.

35.     PII is highly valuable to hackers.  Identity thieves use stolen PII for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/financial fraud.  PII that is stolen from the point of sale are known as "dumps."  *See* Krebs on Security April 16, 2016, Blog Post, *available at* https://krebsonsecurity.com/2016/04/all-about-fraud-how-crooks-get-the-cvv/, attached hereto as **Exhibit C**.  PII can be used to clone a debit or credit card.  *Id.*

36.     Once someone buys PII, it is then used to gain access to different areas of the victim's digital life, including bank accounts, social media, and credit card details.  During that process, other sensitive data may be harvested from the victim's accounts, as well as from those belonging to their family members, friends, and colleagues.

37.     In addition to PII, a hacked email account can be very valuable to cybercriminals. Since most online accounts require an email address not only as a username, but also as a way to verify accounts and reset passwords, a hacked email account could open up a number of other accounts to an attacker.[1]

38.     As shown below, a hacked email account can be used by an identity thief to link to many other sources of information, including any purchase or account information found in the hacked email account.[2]

---

[1] Identity Theft and the Value of Your Personal Data, Trend Micro (Apr. 30, 2015), https://www.trendmicro.com/vinfo/us/security/news/online-privacy/identity-theft-and-the-value-of-your-personal-data.
[2] Brian Krebs, The Value of a Hacked Email Account, Krebs on Security (June 13, 2013, 3:14 PM), https://krebsonsecurity.com/2013/06/the-value-of-a-hacked-email-account/.

11
AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

39.     Hacked information can also enable thieves to obtain other personal information through "phishing."   According to the Report on Phishing available on the United States, Department of Justice's website: "AT&T, a large telecommunications company, had its sales system hacked into, resulting in stolen order information including full names and home addresses, order numbers, and credit card numbers.  The hackers then sent each customer a highly personalized e-mail indicating that there had been a problem processing their order and re-directing them to a spoofed website where they were prompted to enter further information, including birthdates and Social Security numbers."[3]

40.     In addition to transactions involving PII on the dark web, transactions involving PII also occur legally on "white" markets, which provides further corroboration that PII has real, provable, and monetary value.  This is evidenced by the fact that tech giants, such as Facebook, have spent billions of dollars acquiring social media websites and platforms, transactions in which one of the primary (if not the most valuable) assets sought and acquired is user or customer PII.

41.     Finally, there are now startup companies designing platforms on which users can take control of and monetize their own personal data.  One such company, UBDI, was founded in 2018 and its mission is to create a "Universal Basic Data Income" stream.  UBDI's platform

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

---

[3] https://www.justice.gov/archive/opa/docs/report_on_phishing.pdf

allows users to link their accounts from other websites and applications, such as Spotify, Twitter, and Apple Health – which can contain both user PII and PHI – for "opportunities to earn in data studies" by essentially selling UBDI access to their personal data.  *See* https://www.ubdi.com/. The value of PII can be evidenced using market-based pricing data from both dark and white web marketplaces.  This well-established and peer-reviewed "market approach" is premised on the idea that the fair market value of an item, whether tangible or intangible, is evidenced by the amount that buyers and sellers would negotiate for the item in a market transaction.  Because it is possible to assign a monetary value to PII using a market approach, it is of no consequence whether or not Plaintiff has ever intended, or intends in the future, to sell his own PII in either a legal or illegal market. Based on these tested and methodologically sound statistical approaches, it is clear that PII is arising, in this digital age, as an increasingly commodified and exchanged intangible asset with an undeniable, intrinsic value – a value of which victims of a data breach are wrongfully deprived.

### E.  The Data Breach Has Resulted and Will Result in Identity Theft and Identity Fraud

42.    Defendants failed to implement and maintain reasonable security procedures and practices appropriate to protect the PII of Plaintiff and Class Members.

43.    The ramifications of Defendants' failure to keep Plaintiff's and Class Members' PII secure is severe.  According to Javelin Strategy and Research, "one in every three people who is notified of being a potential fraud victim becomes one . . . with 46% of consumers who had cards breached becoming fraud victims that same year."  "Someone Became an Identity Theft Victim Every 2 Seconds Last Year," Fox Business, Feb. 5, 2014 *available* at http://www.foxbusiness.com/personal-finance/2014/02/05/someone-became-identitytheft-victim-every-2-seconds-last-year.html attached hereto as **Exhibit D**.

44.    In the case of a data breach, simply reimbursing a consumer for a financial loss due to fraud does not make that individual whole again.  On the contrary, after conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems."  *See* "Victims of Identity Theft," U.S. Department of Justice, Dec 2013, *available at*

**WILSHIRE LAW FIRM, PLC**
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

https://www.bjs.gov/content/pub/pdf/vit12.pdf attached hereto as **Exhibit E**.  In fact, the BJS reported, "resolving the problems caused by identity theft [could] take more than a year for some victims." *Id.* at 11.

45.     A person whose PII has been obtained and compromised may not know or experience the full extent of identity theft or fraud for years.  It may take some time for the victim to become aware of the theft or fraud.  In addition, a victim may not become aware of fraudulent charges when they are nominal because typical fraud-prevention algorithms fail to capture such charges.  Those charges may be repeated, over and over again, on a victim's account without notice for years.

### F.   *Annual Monetary Losses from Identity Theft are in the Billions of Dollars*

46.     According to the BJS, an estimated 17.6 million people were victims of one or more incidents of identity theft in 2014.  Among identity theft victims, existing bank or credit card accounts were the most common types of misused information.  *Id*.

47.     Javelin Strategy and Research reports that losses from identity theft reached $21 billion in 2013.  *See* 2013 Identity Fraud Report, attached hereto as **Exhibit F**.  There may be a "dormant period" between when harm occurs and when it is discovered, and also between when PII is stolen and when it is used.  According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

See GAO, Report to Congressional Requesters, at 33 (June 2007), *available at* http://www.gao.gov/new.items/d07737.pdf, attached hereto as **Exhibit G**.

48.     As a result of the data breach, Plaintiff and Class Members now face years of continuous monitoring and surveillance of their financial and personal records, and intrusion on their privacy rights.  Plaintiff and Class Members are also subject to a higher risk of phishing and

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12ᵗʰ Floor
Los Angeles, CA 90010-1137

pharming whereby hackers exploit information they already obtained in an effort to procure even more PII.  Plaintiff and Class Members are presently incurring and will continue to incur such damages, in addition to any fraudulent credit and debit card charges, and the resulting loss of access to their funds or lines of credit when those accounts must be frozen or modifiedwhether or not such charges are ultimately reimbursed by the credit card companies.  In addition, Plaintiff and Class Members now run the risk of unauthorized individuals opening credit card or bank account, taking out loans or mortgages, and engaging in other fraudulent conduct using their identities.

### G.  *Plaintiff and Class Members Suffered Damages*

49.     The exposure of Plaintiff's and Class Members' PII to unauthorized third-party hackers was a direct and proximate result of Defendants' failure to properly safeguard and protect Plaintiff's and Class Members' PII from unauthorized access, use, and disclosure, as required by a common law duty of care, which is established by federal information security standards.  The data breach was a result of Defendants' failure to establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class Members' PII in order to protect against reasonably foreseeable threats to the security or integrity of such information, as also required by federal standards.

50.     Plaintiff's and Class Members' PII is private and sensitive in nature and was inadequately protected by Defendants.  As a direct and proximate result of Defendants' wrongful actions and inaction and the resulting data breach, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing risk of harm from identity theft and financial fraud, requiring them to expend time and effort to mitigate the actual and potential impact of the data breach on their lives by, among other things, placing "freezes" on and setting up "alerts" with credit reporting agencies for their accounts, contacting and following up with their financial institutions, and closely reviewing and monitoring their credit reports and accounts for unauthorized activity.  Plaintiff and Class Members have also incurred out-of-pocket expenses including, but not limited to, for credit monitoring and identity theft protection subscription

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12ᵗʰ Floor
Los Angeles, CA 90010-1137

AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

services, postage costs, and hiring attorneys, accountants, and other specialists to assist with recovery and mitigation efforts.

51.     Although many large corporations that suffer data breaches now commonly offer their affected customers one free year of credit monitoring services, there are notable differences between these free services and "compensated" services (those that customers must pay for out-of-pocket).  Compensated services provide additional, and downright necessary, benefits that are usually not included with the free services offered by these companies.  These added benefits include monitoring for stolen funds and personal expenses, legal insurance protections, enhanced financial account monitoring, and access to resolution/restoration specialist services.  On June 9, 2020, Plaintiff was made to purchase one such compensated credit monitoring service, Norton LifeLock, which renews annually, and which Plaintiff expects to continue paying for in perpetuity as a result of this data breach.

52.     The website for Norton LifeLock, a popular and reputable data protection services provider, recommends that, even with the purchase of monitoring services, victims of a data breach should still "stay alert" and "monitor [their] accounts closely."  Other major companies, including U.S. News and Experian, have issued similar guidance to continuously review credit reports, mail, and billing statements for signs of fraud after suffering a data breach..  All of these monitoring activities cost not only money, but time and effort.  This time and effort may not appear facially to be a significant day-to-day expense but, in the aggregate over the course of years, will cost the victims of data breaches hours of their free time and much turmoil.

53.     Breach-related damages in the form of lost time can reasonably be quantified monetarily and calculated as a function of hours spent times a labor rate.  One reasonable method of assigning a monetary value to the time spent by victims to respond to and mitigate the consequences of a data breach is to determine the rate these victims would have to pay a specialist – such as an administrative assistant, accountant, bookkeeper, or auditor – to perform the monitoring activities that they must otherwise conduct themselves.  Plaintiff and Class Members have already or will need to spend hours of their time monitoring their financial and credit accounts for indicia of fraud now that their PII has been leaked, not knowing who has now had

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

access to their PII or what those actors may one day do with it. This time has been spent by Plaintiff and the Class Members, just as they have spent their money mitigating the damage from Defendants' data breach, as this lost time has real and calculable monetary value. And just as Plaintiff's and Class Members' out-of-pocket expenditures were reasonable and necessary to protect themselves from further damage resulting from the data breach, so too was Plaintiff's and Class Members' expenditure of time and labor on such mitigation efforts.

54.     In *Corona v. Sony Pictures Entertainment Inc.*, the Court ruled that credit monitoring may be compensable in a data breach action "where evidence shows that the need for future monitoring is a reasonably certain consequence of the defendant's breach of duty, and that the monitoring is reasonable and necessary." *Corona v. Sony Pictures Ent., Inc.*, 2015 WL 3916744, at *4 (C.D. Cal. June 15, 2015). To determine the reasonableness and necessity of such credit monitoring services, the Court considered a five-factor test laid out in *Potter v. Firestone Tire & Rubber Co.* As adapted to the data breach context, those factors are: (1) the significance and extent of the compromise to Plaintiffs' PII; (2) the sensitivity of the compromised information; (3) the relative increase in the risk of identity theft when compared to (a) Plaintiffs' chances of identity theft had the data breach not occurred, and (b) the chances of the public at large being subject to identity theft; (4) the seriousness of the consequences resulting from identity theft; and (5) the objective value of early detection. *Potter v. Firestone Tire & Rubber Co.*, 6 Cal.4th 965, 1008 (1993).

55.     Upon review of the allegations, the *Corona* Court found that Plaintiffs' factual allegations supported the reasonableness and necessity of Plaintiffs' credit monitoring. First, Plaintiffs allege that Sony's data breach resulted in the public disclosure of its employees' most sensitive, non-public PII, including names, home and email addresses, and bank account information. *Corona*, 2015 WL 3916744 at *4. These records were posted on file-sharing websites and traded on torrent networks. *Id.* As to the risk of identity theft, the Court found it reasonable to infer that the data breach and resulting publication of Plaintiffs' PII drastically increased their risk of identity theft, relative to both the time period before the breach, as well as to the risk born by the general public. *Id.* The Court determined that it is commonly known that

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

the consequences resulting from identity theft can be both serious and long-lasting. *Id.* Lastly, the Court found allegations that some plaintiffs had already received notification of attempted identity theft highlighted the value of early detection. *Id.*

56.     Here, Plaintiff's injuries – the exposure of his name, home address, phone number, and payment information on dark websites – are remarkably similar to those suffered by the plaintiffs in *Corona*. This publication of Plaintiff's PII has certainly drastically increased his risk of identity theft, the consequences of which would be serious and long-lasting. The sale of Plaintiff's PII on the dark web can reasonably be characterized as an attempted identity theft and Plaintiff's discovery of his most personal information on the dark web marketplace has inarguably highlighted the value of early detection of future fraud and misuse of his PII. Plaintiff's purchase of credit monitoring to mitigate damages resulting from Defendants' data breach was both reasonable and necessary and, therefore, compensable.

57.     Defendants' wrongful actions and inactions directly and proximately caused the theft and dissemination of Plaintiff's and Class Members' PII into the public domain, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

    a.     The improper disclosure, compromise, and theft of their PII;

    b.     The imminent and certainly impending injury flowing from potential fraud and identity theft posed by the unauthorized access and misappropriation of their PII by hackers, namely through the sale of Plaintiff's and Class Members' information on the dark web;

    c.     The lack of any notification of the data breach;

    d.     Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the data breach;

    e.     Ascertainable losses in the form of deprivation of the value of their PII, for which there are well-established dark and white web markets;

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

f.    Harms that cannot be quantified or remedied by monetary damages, such as lowered credit scores and identity theft, that can cause long-term and continuing socioeconomic consequences; and

g.    Overpayments to Defendants for the goods bought from Defendant, as Plaintiff and Class Members relied on the reasonable assumption that some proportion of the revenue earned by Defendants from the transactions with Class Members would be allocated to the implementation of reasonable and adequate data security measures that would protect their PII.  Had Plaintiff and Class Members known before entering into these transactions that Defendants would not protect their PII from unauthorized access and use, Plaintiff and Class Members would not have paid the agreed-upon amounts for Defendants' goods.

## CLASS ACTION ALLEGATIONS

58.    Plaintiff brings this action on his own behalf and on behalf of a class of individuals pursuant to Rule 23 of the Federal Rules of Civil Procedure.  Plaintiff intends to seek certification of a class defined as follows:

> All persons residing in the State of California who made online purchases from Walmart's website at any time from four years prior to the date of the filing of the Complaint to the date on which notice was sent to the class (the "Class").

59.    Excluded from the Class are: (a) Defendants, including any entity in which any of the Defendants has a controlling interest, is a parent or a subsidiary of, or which is controlled by any of the Defendants; (b) the officers, directors, and legal representatives of Defendants; and (c) the judge and the court personnel in this case as well as any members of their immediate families. Plaintiff reserves the right to amend the definition of the Class if discovery, further investigation and/or rulings by the Court dictate that it should be modified.

60.    *Numerosity*.  The members of the Class are so numerous that the joinder of all Class Members is impractical.  While the exact number of Class Members is unknown to Plaintiff at this time, given the number of Walmart customers in California, it stands to reason that the

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

number of Class Members is at least in the thousands. Class Members are readily identifiable from information and records in Defendants' possession, custody, or control, such as customer account information.

61.     *Commonality and Predominance.*  This action involves questions of law and fact common to all Class Members that predominate over any questions affecting individual Class Members. These common questions of law and fact include, without limitation:

       a.   Whether Defendants owed a duty of care to Plaintiff and Class Members with respect to the security of their PII;

       b.   What security measures must be implemented by Defendants to comply with their duty of care;

       c.   Whether Defendants met the duty of care owed to Plaintiff and the Class Members with respect to the security of the PII;

       d.    The nature of the relief, including equitable relief, to which Plaintiff and Class Members are entitled; and

       e.   Whether Plaintiff and Class Members are entitled to damages, civil penalties and/or injunctive relief.

62.     *Typicality.*  Plaintiff's claims are typical of those of other Class Members because Plaintiff's PII, like that of each of the other Class Members, was exposed and/or improperly disclosed by Defendants.

63.     *Adequacy of Representation.*  Plaintiff will fairly and adequately represent and protect the interests of the Class Members.  Plaintiff has retained competent counsel experienced in litigation of class actions, including consumer and data breach class actions, and Plaintiff intends to prosecute this action vigorously.  Plaintiff and Class Members have a unified and non-conflicting interest in pursuing the same claims and obtaining the same relief.  Therefore, all Class Members will be fairly and adequately represented by Plaintiff and his counsel.

64.     *Superiority of Class Action.*  A class action is superior to other available methods for the fair and efficient adjudication of the claims alleged in this action. The adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially

20

AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

conflicting adjudications of the asserted claims.  There will be no difficulty in the management of this action as a class action, and the disposition of the claims of the Class Members in a single action will provide substantial benefits to all parties and to the Court.  Damages for any individual Class Member are likely insufficient to justify the cost of individual litigation so that, in the absence of class treatment, Defendants' violations of law inflicting substantial damages in the aggregate would go un-remedied.

65.     Class certification is also appropriate because Defendants have acted or refused to act on grounds generally applicable to the Class Members, such that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

## FIRST CAUSE OF ACTION

(Violation of the California Consumer Privacy Act ("CCPA"), Civ. Code § 1798.150 *et seq.*)

66.     Plaintiff repeats and incorporates by reference each and every allegation contained in paragraphs 1 through 65, inclusive of this Complaint as if set forth fully herein.

67.     Under Civ. Code§ 1798.150(a)(1),

"Any consumer whose nonencrypted and nonredacted personal information, as defined in subparagraph (A) of paragraph (1) of subdivision (d) of Section 1798.81.5, is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for any of the following:

(A) To recover damages in an amount not less than one hundred dollars ($100) and not greater than seven hundred and fifty ($750) per consumer per incident or actual damages, whichever is greater.

(B) Injunctive or declaratory relief.

(C) Any other relief the court deems proper."

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

68.     Plaintiff and the Class Members provided to Defendants its nonencrypted and nonredacted personal information as defined in § 1798.81.5 in the form of their PII.

69.     Plaintiff and the Class Members' PII was subject to an unauthorized access and exfiltration when it was stolen by hackers and posted on the dark web for sale.

70.     It is probable that this unauthorized access and exfiltration of Plaintiff and Class Member's PII occurred as the result of a single, inclusive data breach of Walmart.com.

71.     This unauthorized access and exfiltration occurred after January 1, 2020, because certain stolen PII that was discovered to be a part of the same data breach that Plaintiff's PII was a part of could not have been issued prior to January 1, 2020.  Many of the "last order dates" of stolen customer data that have been found on the dark web are from 2020, further supporting that said data came from a breach that occurred in 2020. In addition, the stolen data includes credit cards with expiration dates occurring sufficiently in advance such that the cards could not have been issued before January 1, 2020.

72.     These credit and debit card expiration dates provide sound evidence that those customer accounts and data must have been stolen from Walmart's website after January 2020. Some of the credit and debit card information listed for sale have expiration dates in 2024 and 2025.    Credit  cards  are  generally  configured  to  expire  after  three  years.   *See* https://wallethub.com/edu/cc/credit-cards-expiration-date/25566/.   For example, Capital One specifically  states  that  its  credit  cards  expire  after  three  to  five  years.    *See* https://www.capitalone.com/learn-grow/money-management/credit-card-expiration-and-replacement/.    American  Express  Corporate  cards  expire  after  four  years.    *See* https://business.americanexpress.com/ru/en/frequently-asked-questions/icc-corporate-cardprogram/faq-1/.    EDD  debit  cards  in  California  expire  after  three  years.    *See* https://edd.ca.gov/about_edd/The_EDD_Debit_Card.htm/.   Given these examples from major card issuers, there is a high probability that many of the sale listings containing Walmart customers' payment information are for credit and debit cards that were issued after January 2020. This indicates that the breach in Defendants' cybersecurity environment must have either first occurred after or continued through January 2020.

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12ᵗʰ Floor
Los Angeles, CA 90010-1137

73.     The unauthorized access, exfiltration, theft, and disclosure of Plaintiff and the Class Members' PII was a result of Walmart's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information.   A scan of Walmart's domains using OWASP ZAP resulted in the exposure of six major vulnerabilities, which include:

- Private IP addresses being disclosed in the public website code.
- 44 instances of password autocomplete enabled.
- The cookie No HttpOnlyFlag being set, which means that cookies can be accessed by scripts or malware on the client machine.
- 8,615 instances of XSS protection not enabled.
- 100,061 instances of Cross Domain JavaScript source file inclusion.
- 93,060 instances of a cookie without the secure flag being set.

74.     An OWASP ZAP scan of http://grocery.walmart.com and the IP address for Walmart photos revealed similar vulnerabilities on those websites.

75.     After scanning less than 2% of the Walmart website using the Vega vulnerability scanner, 228 high ranking vulnerabilities materialized.   Within the integer overflow vulnerability were exposed numbers, of which 224 appeared to be in the format of social security numbers, and multiple numbers that appeared to be in the format of credit card numbers.     Vega also found 7 instances where local paths were revealed, which can allow hackers to obtain sensitive information about the server environment.

76.     A scan using the Nessus PCI tool scan revealed 20 PCI vulnerabilities, each ranked as high, and identified the following severe issues, each of which would be considered to be an "automatic failure" according to the PCI DSS Approved Scanning Vendors Program Guide (version 3.1):

- Vulnerabilities with a CVSS base score greater than or equal to 4.0;
- Unsupported operating systems;
- Internet reachable database servers;
- Presence of built-in or default accounts;

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

23

- Unrestricted DNS Zone transfers;

- Unvalidated parameters leading to SQL injection attacks;

- Cross-Site Scripting (XSS) flaws;

- Directory traversal vulnerabilities;

- HTTP response splitting/header injection;

- Detection of backdoor applications (malware, trojan horses, rootkits, backdoors);

- Use of older, insecure SSL/TLS versions;

- Use of anonymous key exchange protocols (such as anonymous Diffie-Hellman in SSL/TLS); and

- Scan Interference.

77.   The Nessus PCI scan also located three problems with Walmart.com's SSL/TLS certificates.   SSL/TLS stands for Secure Sockets Layer/Transport Layer Security and is how websites encrypt data transmissions.   SSL/TLS utilizes digital certificates to encrypt data. Security flaws in SSL/TLS certificates make all transmissions vulnerable, including transmissions of credit card information and account details.

78.   The Nessus PCI scan identified the following problems with Walmart.com's SSL/TLS certificates:  SSL certificate cannot be trusted, SSL certificate with wrong hostname, and SSL self-signed certificate.   Each of these problems means that data transmissions on the website are vulnerable.

79.   The Nessus PCI scan also revealed that Defendant is using an outdated protocol, TLS Version 1.1, which is technology that was replaced 12 years ago and has known weaknesses.

80.   As a net result of these vulnerabilities in Walmart.com, it is possible for hackers to obtain large amounts of customer PII entered into and stored by Walmart.com in one fell swoop.  Data stolen in such a manner would include customer PII that had been entered into Walmart.com prior to the date of the actual data breach itself.   As such, the hacking of Walmart.com that occurred in 2020 would most likely also include data that was provided to Walmart in 2019 as well.

81.   Under Walmart's duty to protect the PII, it was required to institute reasonable

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12ᵗʰ Floor
Los Angeles, CA 90010-1137

24

security measures on its website to deter hacks.  These vulnerabilities show that Walmart has breached that duty.

82.     Plaintiff and Class Members have suffered monetary injury in fact as a direct and proximate result of the acts committed by Defendants, as alleged herein, in an amount to be proven at trial, but in excess of the minimum jurisdictional amount of this Court.

83.     Further, Plaintiff, Class Members, and future customers who make purchases and/or open accounts on Walmart's website are at high risk of suffering, or have already suffered, injuries that cannot be remedied monetarily, such as reductions to their credit scores and identity theft.  As such, the remedies at law available to Plaintiff and Class Members are wholly inadequate by themselves.  Injunctive relief – including mandating Defendants' compliance with federal information security statutes and regulations – is both appropriate and necessary to prevent further, irreparable harm to consumers resulting from the unabated harvesting of customer PII from Walmart's website.  The full extent of the existing and potential harm caused by Defendants' failure to protect their customers' PII cannot be remedied by monetary damages alone because monetary compensation does nothing to prevent the reoccurrence of another data breach in the future.

## SECOND CAUSE OF ACTION

### (Negligence)

84.     Plaintiff repeats and incorporates by reference each and every allegation contained in paragraphs 1 through 83, inclusive of this Complaint as if set forth fully herein.

85.     Defendants owed Plaintiff and the Class Members, as customers, a duty of care in the handling of PII, which duty included keeping that PII safe and preventing disclosure of that PII to all unauthorized third parties.  This duty of care existed independently of Defendants' contractual duty to Plaintiff and the Class Members. Under the CCPA, the Federal Trade Commission ("FTC") Guidelines, and other sources of industry-wide standards, Defendants must incorporate adequate measures to safeguard and protect the PII.

86.     As noted, the CCPA creates a duty for all businesses in California to implement and maintain reasonable security procedures and practices appropriate to the nature of the

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12ᵗʰ Floor
Los Angeles, CA 90010-1137

information to protect personal information.

87. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices for business.[4]  Among other things, the guidelines note businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[5]

88. Additionally, the FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[6]

89. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[7]

90. Additional industry guidelines which provide a standard of care can be found in

---

[4] Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personalinformation.pdf (last visited Nov. 22, 2019).
[5] *Id.*
[6] Federal Trade Commission, *Start With Security: A Guide for Business* (Jun. 2015) https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.
[7] Federal Trade Commission, *Privacy and Security Enforcement: Press Releases* https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-securityenforcement (last visited Nov. 22, 2019).

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd., 12th Floor
Los Angeles, CA 90010-1137

the National Institute of Standards and Technology's ("NIST's") Framework for Improving Critical Infrastructure Cybersecurity, available at https://nvlpubs.nist.gov/nistpubs/CSWP/NIST.CSWP.04162018.pdf, attached hereto as **Exhibit H**.  Among other guideposts, the NIST's framework identifies seven steps for establishing or improving a cybersecurity program (section 3.2).  Those steps are:

> *Step 1: Prioritize and Scope*. The organization identifies its business/mission objectives and high-level organizational priorities. With this information, the organization makes strategic decisions regarding cybersecurity implementations and determines the scope of systems and assets that support the selected business line or process. The Framework can be adapted to support the different business lines or processes within an organization, which may have different business needs and associated risk tolerance. Risk tolerances may be reflected in a target Implementation Tier.

> *Step 2: Orient*. Once the scope of the cybersecurity program has been determined for the business line or process, the organization identifies related systems and assets, regulatory requirements, and overall risk approach. The organization then consults sources to identify threats and vulnerabilities applicable to those systems and assets.

> *Step 3: Create a Current Profile*. The organization develops a Current Profile by indicating which Category and Subcategory outcomes from the Framework Core are currently being achieved. If an outcome is partially achieved, noting this fact will help support subsequent steps by providing baseline information.

> *Step 4: Conduct a Risk Assessment*. This assessment could be guided by the organization's overall risk management process or previous risk assessment activities. The organization analyzes the operational environment in order to discern the likelihood of a cybersecurity event and the impact that the event could have on the organization. It is important that organizations identify emerging risks and use cyber threat information from internal and external sources to gain a better understanding of the likelihood and impact of cybersecurity events.

> *Step 5: Create a Target Profile*. The organization creates a Target Profile that focuses on

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

27

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

the assessment of the Framework Categories and Subcategories describing the organization's desired cybersecurity outcomes. Organizations also may develop their own additional Categories and Subcategories to account for unique organizational risks. The organization may also consider influences and requirements of external stakeholders such as sector entities, customers, and business partners when creating a Target Profile. The Target Profile should appropriately reflect criteria within the target Implementation Tier. *Step 6: Determine, Analyze, and Prioritize Gaps*. The organization compares the Current Profile and the Target Profile to determine gaps. Next, it creates a prioritized action plan to address gaps – reflecting mission drivers, costs and benefits, and risks – to achieve the outcomes in the Target Profile. The organization then determines resources, including funding and workforce, necessary to address the gaps. Using Profiles in this manner encourages the organization to make informed decisions about cybersecurity activities, supports risk management, and enables the organization to perform cost-effective, targeted improvements.

*Step 7: Implement Action Plan*. The organization determines which actions to take to address the gaps, if any, identified in the previous step and then adjusts its current cybersecurity practices in order to achieve the Target Profile. For further guidance, the Framework identifies example Informative References regarding the Categories and Subcategories, but organizations should determine which standards, guidelines, and practices, including those that are sector specific, work best for their needs.

(*Id.*)

91.     The PCI Data Security Standard ("DSS"), which includes a library of documents available at https://www.pcisecuritystandards.org/document_library?category=educational_ resources&document=pci_dss_large_org, is also a source of duties of care applicable to Defendant.  The PCI DSS sets forth specific security standards applicable to all businesses which process major credit cards, including Defendants.  Included in the documents in the PCI DSS library is a document titled Best Practices for Maintaining PCI DSS Compliance, *available at* https://www.pcisecuritystandards.org/documents/PCI_DSS_V2.0_Best_Practices_for_

Maintaining_PCI_DSS_Compliance.pdf?agreement=true&time=1591897283857, attached hereto as **Exhibit I**.   The entire document establishes a framework for obtaining and maintaining PCI DSS compliance, thereby establishing duties of care applicable to Defendant.

92.   In addition to the PCI DSS library of compliance documents, there is the Requirements and Security Assessment itself: https://www.pcisecuritystandards.org/documents/ PCI_DSS_v3-2-1.pdf?agreement=true&time=1591898978871, attached hereto as **Exhibit J**, which sets forth specific requirements which a company must meet if it is to process major credit cards, as Defendants do.   This document establishes numerous detailed duties which applies to Defendants, including requirement 6.5.7, which concerns cross-site scripting:

> *6.5.7*: Examine software-development policies and procedures and interview responsible personnel to verify that XSS is addressed by coding techniques that include:
>
> > • Validating all parameters before inclusion;
> >
> > • Utilizing context-sensitive escaping. (*Id*.)   Other statutory duties can be found in California's Customer Records Act, Civ. Code §§ 1798.81.5 (requiring reasonable data security measures) and 1798.82 (requiring timely breach notification).

93.   In addition to Defendants' obligations under federal regulations and industry standards, Defendants owed a duty to Plaintiff and the Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiff and the Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that their computer systems and networks, and the personnel responsible for them, adequately protected the PII of Plaintiff and the Class Members.

94.   Defendants owed a duty to Plaintiff and the Class Members to design, maintain, and test their computer system to ensure that the PII in Defendants' possession was adequately secured and protected.

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

95.     Defendants owed a duty to Plaintiff and the Class Members, to create and implement reasonable data security practices and procedures to protect the PII in their possession, including training their employees and others who accessed PII within their computer systems on how to adequately protect PII.

96.     Defendants owed a duty to Plaintiff and the Class Members to implement processes that would detect a breach of their data security systems in a timely manner.

97.     Defendants owed a duty to Plaintiff and the Class Members to act upon data security warnings and alerts in a timely fashion.

98.     Defendants owed a duty to Plaintiff and the Class Members to disclose whether their computer systems and data security practices were inadequate to safeguard individuals' PII from theft because such an inadequacy would be a material fact in their decision to entrust PII with Defendants or to make credit card purchases from Defendants.

99.     Defendants owed a duty to Plaintiff and the Class Members to disclose in a timely and accurate manner when data breaches occurred.

100.    Defendants owed a duty of care to Plaintiff and the Class Members because they were foreseeable and probable victims of any inadequate data security practices.  Defendants collected PII from Plaintiff and the Class Members directly.  Defendants knew that a breach of its data systems would cause Plaintiff and the Class Members to incur damages.

101.    Defendants breached their duties of care to safeguard and protect the PII which Plaintiff and the Class Members entrusted to them.  Defendants adopted inadequate safeguards to protect the PII, and, as shown, failed to adopt industry-wide standards set forth above in their supposed protection of the PII.  Defendants failed to design, maintain, and test their computer system to ensure that the PII was adequately secured and protected, failed to create and implement reasonable data security practices and procedures, failed to implement processes that would detect a breach of their data security systems in a timely manner, failed to disclose the breach in a timely and accurate manner, and otherwise breached each of the above duties of care by implementing lax security procedures which led directly to the breach.

102.    Defendants breached the duties set forth in the CCPA, the FTC Guidelines,

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12ᵗʰ Floor
Los Angeles, CA 90010-1137

California's Customer Records Act, Civ. Code §§ 1798.81.5, 1798.82, the NIST's Framework for Improving Critical Infrastructure Cybersecurity, and the PCI DSS. In violation of the CCPA, Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information. In violation of the FTC Guidelines, *inter alia*, Defendants did not protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.  In violation of the NIST's Framework, Defendant, inter alia, failed to adopt sufficient resources to identify and address security gaps.  And, as shown, Defendant violated the PCI-DSS in at least the following ways, in addition to the other violations listed above:

- Vulnerabilities with a CVSS base score greater than or equal to 4.0;

- Unsupported operating systems;

- Internet reachable database servers;

- Presence of built-in or default accounts;

- Unrestricted DNS Zone transfers;

- Unvalidated parameters leading to SQL injection attacks;

- Cross-Site Scripting (XSS) flaws;

- Directory traversal vulnerabilities;

- HTTP response splitting/header injection;

- Detection of backdoor applications (malware, trojan horses, rootkits, backdoors);

- Use of older, insecure SSL/TLS versions;

- Use of anonymous key exchange protocols (such as anonymous Diffie-Hellman in SSL/TLS); and

- Scan Interference.

103.   Finally, in violation of the California Customer Records Act, Defendants failed to employ reasonable security measures, and failed to timely notify Plaintiff and the Class Members of the breach.  Indeed, Defendants have, to date, failed to notify its customers of the breach.

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

104.    As a direct and proximate result of Defendants' failure to adequately protect and safeguard the PII, Plaintiff and the Class members suffered damages.  Plaintiff and the Class Members were damaged because their PII was accessed by third parties, resulting in increased risk of identity theft and theft of property, and for which Plaintiff and the Class members were forced to adopt costly and time-consuming preventive and remediating efforts.  Plaintiff and the Class Members were also damaged in that they paid for goods sold by Defendants in an amount that they would have refused to pay had they known that Defendants would not protect their PII. These damages were magnified by the passage of time because Defendants failed to notify their customers of the data breach.

105.    Plaintiff and Defendants were in a "special relationship" which eliminates the bar of recovery on economic harm for this claim.  Under *J'Aire Corp. v. Gregory,* 24 Cal.3d 799, 804, 157 Cal.Rptr. 407, 410, 598 P.2d 60, 63 (1979), "[e]ven when only injury to prospective economic advantage is claimed, recovery is not foreclosed;" instead, "[w]here a special relationship exists between the parties, a plaintiff may recover for loss of expected economic advantage through the negligent performance of a contract." *J'Aire* applies both where parties are in contractual privity and when they are not in contractual privity.  *N. Am. Chem. Co. v. Superior Ct.*, 59 Cal. App. 4th 764, 783, 69 Cal. Rptr. 2d 466, 476 (1997) (citing *Ott v. Alfa–Laval Agri, Inc.*, 31 Cal.App.4th 1439, 1448, 37 Cal.Rptr.2d 790 (1995)); *Pisano v. American Leasing*, 146 Cal.App.3d 194, 197, 194 Cal.Rptr. 77 (1983). "As the *Ott* court put it, 'the reasoning of *J'Aire* is wholly incompatible with a limitation of the cause of action to those instances in which the plaintiff and defendant are not in privity, …'" *N. Am. Chem. Co.*, 59 Cal. App. 4th at 783 (citing *Ott v. Alfa–Laval Agri, Inc.*, 31 Cal.App.4th at 1448.)

106.    Plaintiff satisfies each of the "special relationship" factors enumerated in *J'Aire*. "Those criteria are (1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct and (6) the policy of preventing future harm." *J'Aire*, 24 Cal.3d at 804.

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

107.   In *J'Aire*, "The contract entered into between respondent and the county was for the renovation of the premises in which appellant maintained its business." *Id.* "The contract could not have been performed without impinging on that business." *Id.* "Thus respondent's performance was intended to, and did, directly affect appellant." *Id.* In short, the test for the first factor, the extent to which the transaction was intended to affect the plaintiff, was whether the contract could have been performed without affecting Plaintiff. Here, as Plaintiff engaged in the contract at issue, purchasing items from Defendants, the contract could not have been performed without affecting Plaintiff. Accordingly, the first factor is met.

108.   As to the second factor, the foreseeability of harm to the Plaintiff, harm was most certainly foreseeable. In 2020, over 155.8 million Americans were affected by data exposures. https://www.statista.com/statistics/273550/data-breaches-recorded-in-the-united-states-by-number-of-breaches-andrecordsexposed/#:~:text=In%202020%2C%20the%20number%20of,%2Dthan%2Dadequate%20information%20security/.  Hackers are constantly looking to invade business' systems and obtain the valuable PII of their customers. It is foreseeable that, if reasonable security measures are not taken, a business will be subject to a data breach, and its customers' data will be exposed to hackers. That is what happened.

109.   As to the third factor, the degree of certainty that Plaintiff suffered injury, it is highly certain that Plaintiff did in fact suffer injury because his PII, including his credit card number and all data necessary to access the credit card account, was posted on the dark web for sale by hackers. Once this data is exposed on the dark web, it cannot be removed. Because Plaintiff's data was posted for sale on the dark web, it is virtually certain that his data will eventually be used by a hacker to commit fraud and identity theft unless Plaintiff goes to great lengths and expends money and time to protect himself.

110.   As to the fourth factor, the closeness of the connection between Defendants' conduct and the injury suffered, there is a high degree of closeness of that connection, because Defendants' negligence in adopting adequate measures to protect the PII was a direct and proximate cause of the data breach. Due to the pervasive nature of hackers' attacks on businesses' systems, searching for customer PII, it was highly certain that hackers would attack Defendants'

systems and obtain data from them, given the vulnerabilities that those systems present.  If a bank does not lock its vault, and the money is stolen therefrom, there is a high degree of closeness between the conduct of failing to lock the vault, and the theft.  So too, here, where Defendants failed to adequately protect their system from attack, there is a high degree of closeness between that failure and the resultant theft of data.

111.    As to the fifth factor, the moral blame attached to Defendants' conduct, there is a high degree of moral blame because, in today's economy, consumers are forced to trust companies with an internet presence to protect their data, which must be conveyed to companies in order to transact business online.  If we are to incentivize transactions over the internet, we must assess a high level of moral blame to a company that does not protect its customers' PII because, without that protection, consumers will stop transacting online, and the internet economy will die.

112.    As to the fifth factor, the policy of preventing future harm, the only way to incentivize companies like Walmart to protect consumers' PII is to hold them accountable when their negligence in protecting that data results in a breach.  To give force to the duties which, through industry standards and regulations, exist as to the protection of data, there must be consequences when those duties are breached.  Otherwise those duties have no teeth, so to speak, and they become mere words without consequences for lack of enforcement.  In short, if we want companies to protect their customers' data, and undertake the costly measures necessary to do so, we must hold those companies liable when they do not protect that data.  Companies like Walmart can often evade damages for contract-related causes of action, leaving negligence as the only means through which the courts can incentivize the important measures, central to our internet economy, of protecting PII.  If we want consumers to trust companies enough to transact business online, and provide their PII over the internet, we must hold those companies responsible when they breach that trust.

113.    Plaintiff has suffered monetary injury in fact as a direct and proximate result of the acts of negligence committed by Defendants as alleged herein in an amount to be proven at trial but in excess of the minimum jurisdictional amount of this Court.

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd., 12ᵗʰ Floor
Los Angeles, CA 90010-1137

34

1

**THIRD CAUSE OF ACTION**

2

(Violation of the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et. seq.*)

3      114.    Plaintiff repeats and incorporates by reference each and every allegation contained

4    in paragraphs 1 through 113, inclusive of this Complaint as if set forth fully herein.

5      115.    By their actions and conduct as alleged herein, Defendants have committed one or

6    more acts of unfair competition within the meaning of the UCL, Bus. & Prof. Code § 17200, that

7    constitute unfair, unlawful and/or fraudulent business practices as those terms are defined under

8    California law.

9      116.    Defendants' business practices are unfair under the UCL because Defendants have

10   acted in a manner that is immoral, unethical, oppressive, unscrupulous and/or substantially

11   injurious to Plaintiff and the Class Members.  The exposure of PII to third parties is substantially

12   injurious because of the significant harm that can result to the customer at the hand of those third

13   parties, and the protective measures that the customer must undertake as a direct result of this

14   exposure.  Further, the impact of the practice against Plaintiff and the Class Members far

15   outweighs any possible justification or motive on the part of Defendants.  Plaintiff and the Class

16   Members could not reasonably have avoided this injury because they relied upon Defendants'

17   promises to protect and safeguard the PII from disclosure, as all consumers must who participate

18   in today's largely electronic market.  Finally, Defendants have committed an unfair act by failing

19   to notify its customers of the breach whatsoever.

20      117.    Defendants' failure to safeguard and protect Plaintiff's and the Class Members'

21   PII is violative of public policy as expressed in the CCPA, the FTC publications, including,

22   Protecting Personal Information: A Guide for Business, https://www.ftc.gov/system

23   /files/documents/plain-language/pdf-0136_proteting-personalinformation.pdf (last visited Nov.

24   22, 2019), the NIST's Framework for Improving Critical Infrastructure Cybersecurity, and the

25   PCI DSS.  These regulations and guidelines set forth a clear public policy that companies such as

26   Walmart take appropriate measures to prevent the exposure of customers' PII to hackers,

27   measures which, as shown *supra*, were not taken by Defendants here.

28      118.    Defendants' business practices are also unfair because they significantly threaten

**WILSHIRE LAW FIRM, PLC**
3055 Wilshire Blvd, 12ᵗʰ Floor
Los Angeles, CA 90010-1137

35

or harm competition.  Participation in today's credit economy is predicated on the security of the PII of the participants in that economy, in the sense that PII is an asset of the individual which, if lost to him or her, jeopardizes his or her very ability to maintain capital.  Competitive economic activity cannot exist where PII goes unprotected.

119.    Defendants' business practices are unlawful under the UCL because Defendants have violated the CCPA, the FTC Act, and California's Customer Records Act, Civ. Code §§ 1798.81.5 and 1798.82.   In violation of the CCPA, Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect personal information.  Defendants' conduct also constituted an unfair or deceptive practice under the FTC Act because it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. 45(n).  Consumers cannot avoid the injury themselves because they are not informed of the severe vulnerabilities presented by the website. There is no benefit to consumers or competition to a vulnerable website, so the injury cannot be outweighed by any such countervailing benefit.   In violation of the Customer Records Act, Defendants failed to institute reasonable security measures, and failed to notify Plaintiff and the Class Members of the breach whatsoever.

120.    Plaintiff has suffered monetary injury in fact as a direct and proximate result of the acts of unfair competition committed by Defendants, as alleged herein, in an amount to be proven at trial, but in excess of the minimum jurisdictional amount of this Court.  Plaintiff suffered a monetary injury when he was forced to purchase credit monitoring services and undertake other efforts to reduce the risk of identity theft from the security breach.  These are direct pecuniary losses which are attributable to Defendants' violation of the UCL.

121.    Plaintiff also suffered a monetary injury because he did not receive the benefit of his bargain with Defendants, through which he agreed to pay for goods with the understanding that his payment information would be protected by Defendants.  Plaintiff would not have paid the price he agreed to pay for the goods if he had known that Defendants would not protect his PII.

122.   Plaintiff also suffered a monetary injury when he lost the value of his PII, which is an exclusive asset of each individual with intrinsic and calculable monetary value.  Now that his PII has been exposed to hackers and sold on the dark web, Plaintiff has wrongfully been deprived of the fair market value of his PII.

## FOURTH CAUSE OF ACTION

### (Breach of Express Contract)

123.   Plaintiff repeats and incorporates by reference each and every allegation contained in paragraphs 1 through 122, inclusive of this Complaint as if set forth fully herein.

124.   Defendants entered into an express contract with Plaintiff and the Class Members, pursuant to which they provided Defendants with their PII, and Defendants sold them goods. This contract incorporated Walmart's Privacy Policy, which Walmart posts on its website at https://corporate.walmart.com/privacy-security/walmart-privacy-policy, and which is attached hereto as **Exhibit K**.  The privacy policy promises that Walmart will only share the PII with specified persons and entities, none of which are the hackers who obtained the PII in this case.

125.   Plaintiffs and the Class Members performed everything that they were required to do under the contract by supplying their PII and paying for the goods in question.  All conditions required for Defendants' performance have occurred or were excused.

126.   The Privacy Policy states, "We will not share your personal information outside of our corporate family of companies, except in the following circumstances," and proceeds to list eight categories of recipients, none of which were the hackers in this case.  (*Id.* . at p. 5-6)

127.   Further, the Privacy Policy promises that Defendants will adopt reasonable security measures to protect the data in its possession, stating:

How Do We Secure Your Personal Information?

We recognize the importance of maintaining the security of our customers' personal information. ***We use reasonable security measures, including physical, administrative, and technical safeguards to protect your personal information.***

We have a team of associates who are responsible for helping to protect the security of your information. ***Whether you are shopping on our websites, through***

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

37

AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

***our mobile services, or in our stores, we use reasonable security measures,
including physical, administrative, and technical safeguards***. These measures
may include physical and technical security access controls or other safeguards,
information security technologies and policies, procedures to help ensure the
appropriate disposal of information, and training programs.

(*Id*. at p. 9). (emphasis added).

128.   Defendants breached these promises.  As shown, Defendants allowed hackers to obtain the PII, and did not limit its dissemination to the parties set forth in the Privacy Policy. Defendant also failed to adopt reasonable security measures to protect the data, as illustrated by the innumerable security vulnerabilities its website exhibits.

129.   As a result of these breaches, Plaintiff and the Class Members were damaged. Plaintiff and the Class Members' PII is being sold by nefarious individuals on the dark web.  As a result, Plaintiff and the Class Members have been forced to incur out of pocket costs for credit monitoring, and to take time and effort to cancel credit cards and/or freeze accounts.  Plaintiff and the Class Members have also lost the benefit of their bargain.  Plaintiff and the Class Members agreed to purchase goods and provide their PII to Defendants with the understanding that their PII would be protected.  Had Plaintiff and the Class Members known that their PII would not be protected, they would not have agreed to pay the price which they contracted for in exchange for the goods.  Plaintiff and the Class Members also face a significant risk that their PII will be stolen, that they will lose money, and that their identities will be stolen as a result of the breach.  That risk only increases as time passes and no action is taken.  Finally, Plaintiff and the Class Members have lost the value of their PII, which has a real market value.

130.   Plaintiff and the Class Members' losses were caused by Defendants' breach.  By allowing the hackers to obtain the PII, Defendants caused Plaintiff and the Class Members to incur out-of-pocket expenses, lose the benefit of their bargain, incur the risk of identity and property theft, and lose the value of their PII.  By failing to institute reasonable measures to protect the data, each of these categories of damages were also caused, because the hackers breached Defendants' system and Plaintiff's and the Class Members' computers and accounts due to the

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

vulnerabilities on the website.

131.     To the extent that Defendants plan to raise the limitation of liability and disclaimer of warranty clauses as a bar to Plaintiff's contract-based causes of action, those clauses are substantively and procedurally unconscionable, and cannot be enforced.

132.     First, as to procedural unconscionability, the contract at issue is an adhesion contract, and is therefore afforded a substantial level of procedural unconscionability.  Second, when Plaintiff entered the contract, it contained terms that purported to state promises as to which Defendants would be bound.  It was procedurally unconscionable to take those promises away in subsequent clauses, which might not even be found by a consumer reading the contract for the first time, which clauses eliminated the mutuality of the contract, as Defendants would not be bound under them for any promises whatsoever.  By presenting an agreement, and making promises therein, Defendants indicated that there were terms under the agreement as to which both parties would be bound.  Taking those promises away amounts to an unfair surprise, which is procedurally unconscionable.  Moreover, the contradictory clauses created confusion on the part of the Plaintiff, as it is unclear which provision controls—the provision making the promise, or the provision taking it away.

133.     Second, as to substantive unconscionability, the clauses are substantively unconscionable because they eliminate the mutuality of the agreement, rendering it a unilateral document which imposes requirements on the consumer, but imposes no obligation or restriction on Defendants.  Lack of mutuality is the height of substantive unconscionability.  Moreover, it accords with public policy to interpret contracts so as to render them enforceable.  If the clauses are interpreted as Defendants suggest, the agreement cannot be enforced, because it is utterly lacking in mutual consideration.  If the clauses are enforced, then no contract was formed, and Plaintiff should be permitted to proceed on a quasi-contract, or unjust enrichment theory.

134.     Plaintiff has suffered monetary injury in fact as a direct and proximate result of the acts committed by Defendants, as alleged herein, in an amount to be proven at trial, but in excess of the minimum jurisdictional amount of this Court.

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

**FIFTH CAUSE OF ACTION**

(Breach of Implied Contract)

135.    Plaintiff repeats and incorporates by reference each and every allegation contained in paragraphs 1 through 134, inclusive of this Complaint as if set forth fully herein.

136.    Defendants and Plaintiff and the Class Members entered an implied contract governing the use and protection of PII when Plaintiff and the Class Members supplied their PII in order to purchase goods from Defendants.   Plaintiffs and the Class Members performed everything that they were required to do under the contract by supplying their PII and paying for the goods in question.   All conditions required for Defendants' performance have occurred or were excused.

137.    This contract was manifested in the conduct of the parties.   By agreeing to take Plaintiff's and the Class Members' PII into its possession, Defendants impliedly agreed to protect that PII from hackers, who were known to attempt to steal PII by hacking entities which possess it, to adopt reasonable measures to protect the PII from hackers, and to timely notify Plaintiff and the Class Members of a data breach should one occur.   Defendants knew, or had reason to know, that by taking the PII, they were engaging in conduct that would lead Plaintiff and the Class Members to believe that Defendants would protect that data from exposure to hackers, due to the known risk of hacking, which was understood by both parties to the contract.   Other conduct which gives rise to this contractual agreement is Defendants' adoption of passwords through which Plaintiff and the Class Members ostensibly kept their information private, the posting of a Privacy Policy, and tips to protect personal data, on Defendants' website.

138.    Defendants breached these promises.   As shown, Defendants allowed hackers to obtain the PII.   Defendants also failed to adopt reasonable security measures to protect the data, as illustrated by the innumerable security vulnerabilities its website exhibits.   Finally, Defendants failed to notify its customers of the data breach whatsoever.

139.    As a result of these breaches, Plaintiff and the Class Members were damaged. Plaintiff's and the Class Members' PII is being sold by nefarious individuals on the dark web.   As a result, Plaintiff and the Class Members have been forced to incur out of pocket costs for credit

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12ᵗʰ Floor
Los Angeles, CA 90010-1137

monitoring, and to take time and effort to cancel credit cards and/or freeze accounts.  Plaintiff and the Class Members have also lost the benefit of their bargain.  Plaintiff and the Class Members agreed to purchase goods and provide their PII to Defendants with the understanding that their PII would be protected.  Had Plaintiff and the Class Members known that their PII would not be protected, they would not have agreed to pay the price which they contracted for in exchange for the goods.  Plaintiff and the Class Members also face a significant risk that their PII will be stolen, that they will lose money, and that their identities will be stolen as a result of the breach.  That risk only increases as time passes and no action is taken.  Finally, Plaintiff and the Class Members have lost the value of their PII, which has a real market value.

140.    Plaintiff's and the Class Members' losses were caused by Defendants' breach.  By allowing the hackers to obtain the PII, Defendant caused Plaintiff and the Class Members to incur out-of-pocket expenses, lose the benefit of their bargain, incur the risk of identity and property theft, and lose the value of their PII.  By failing to institute reasonable measures to protect the data, each of these categories of damages were also caused, because the hackers breached Defendants' system and Plaintiff's and the Class Members' computers and accounts due to the vulnerabilities on the website.

141.    Plaintiff has suffered monetary injury in fact as a direct and proximate result of the acts committed by Defendants, as alleged herein, in an amount to be proven at trial, but in excess of the minimum jurisdictional amount of this Court.

## SIXTH CAUSE OF ACTION

(Breach of the Implied Covenant of Good Faith and Fair Dealing)

142.    Plaintiff repeats and incorporates by reference each and every allegation contained in paragraphs 1 through 141, inclusive of this Complaint as if set forth fully herein.

143.    Plaintiff and the Class Members entered contracts with Defendants for the sale of goods, which incorporated the Privacy Policy, and which also included the implied terms that Defendant would not expose the PII to hackers and that Defendants would take reasonable measures to protect the PII.

144.    In these contracts, as in every contract, there was an implied covenant of good

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd., 12th Floor
Los Angeles, CA 90010-1137

41

faith and fair dealing.  This implied promise means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract.  Good faith means honesty of purpose without any intention to mislead or to take unfair advantage of another, that is, being faithful to one's duty or obligation.

145.    Plaintiffs and the Class Members performed everything that they were required to do under the contract by supplying their PII and paying for the goods in question.  All conditions for Defendants' performance have occurred or were excused.

146.    Defendants failed to protect the PII from exposure to hackers, and failed to adopt reasonable measures to protect the PII, operating a website with numerous security flaws as shown above.  Defendants also failed to notify Plaintiff and the Class Members of the breach, so that they could make reasonable efforts to protect their identities and property.

147.    By doing so, Defendants did not act fairly and in good faith.  Good faith and fairness required Defendants to protect the PII from hackers, including by adopting reasonable measures.  Consumers must count on companies who collect their PII to protect that PII in order to facilitate commercial transactions, which increasingly occur over the internet.

148.    As a result of this conduct, Plaintiff and the Class Members were damaged.  Plaintiff's and the Class Members' PII is being sold by nefarious individuals on the dark web.  As a result, Plaintiff and the Class Members have been forced to incur out of pocket costs for credit monitoring, and to take time and effort to cancel credit cards and/or freeze accounts.  Plaintiff and the Class Members have also lost the benefit of their bargain.  Plaintiff and the Class Members agreed to purchase goods and provide their PII to Defendants with the understanding that their PII would be protected.  Had Plaintiff and the Class Members known that their PII would not be protected, they would not have agreed to pay the price which they contracted for in exchange for the goods.  Plaintiff and the Class Members also face a significant risk that their PII will be stolen, that they will lose money, and that their identities will be stolen as a result of the breach.  That risk only increases as time passes and no action is taken.  Finally, Plaintiff and the Class Members have lost the value of their PII, which has a real market value.

149.    Plaintiff has suffered monetary injury in fact as a direct and proximate result of

AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd., 12th Floor
Los Angeles, CA 90010-1137

the acts committed by Defendants, as alleged herein, in an amount to be proven at trial, but in excess of the minimum jurisdictional amount of this Court.

**SEVENTH CAUSE OF ACTION**

(Unjust Enrichment)

150.    Plaintiff repeats and incorporates by reference each and every allegation contained in paragraphs 1 through 149, inclusive of this Complaint as if set forth fully herein.

151.    When Plaintiff transacted with Defendants over the internet for the purchase of goods, Defendants received a benefit from Plaintiff in the form of the price of the item purchased. Plaintiff believed that some portion of this price would be used to pay for measures to protect his PII from disclosure to unauthorized individuals.

152.    Defendants did not pay for the cost of maintaining and/or increasing security measures on its website such that Plaintiff's and Class Members' PII would not be stolen.  Instead, Defendants retained this benefit as profit, and left Plaintiff's and Class Members' PII exposed on its website for hackers to access.  As a result, hackers accessed the data and posted it for sale on the dark web.

153.    Accordingly, Defendants received a benefit from Plaintiff and Class Members and retained that benefit, rather than using it to protect their customers at their customers' expense.

154.    Plaintiff is entitled to either: (1) restitution of the full price he paid for the goods, or (2) restitution of that portion of the price which would be used to provide data protection for Plaintiff's PII.

155.    Plaintiff has suffered monetary injury in fact as a direct and proximate result of the acts committed by Defendants, as alleged herein, in an amount to be proven at trial, but in excess of the minimum jurisdictional amount of this Court.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief as follows:

1.    For compensatory damages in an amount according to proof at trial;

2.    For affirmative injunctive relief mandating that Defendants implement and

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12ᵗʰ Floor
Los Angeles, CA 90010- 1137

43

AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

maintain reasonable security procedures and practices to protect Plaintiff's and Class Members' PII from unauthorized access, destruction, use, modification, or disclosure, and notify Plaintiff and the Class Members of all data breaches which have occurred;

3.   For costs of suit and litigation expenses;

4.   For attorneys' fees under the common fund doctrine and all other applicable law; and

5.   For such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and all others similarly situated, hereby demands a jury trial for all claims so triable.

Dated: March 26, 2021

Respectfully submitted,

Thiago M. Coelho
Justin F. Marquez
Robert J. Dart
April Yang
**WILSHIRE LAW FIRM, PLC**

*Attorneys for Plaintiff
and the Proposed Class*

**WILSHIRE LAW FIRM, PLC**
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010- 1137

AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL